Case number 22-2459 from the District of North Dakota, Mandan, Hidatsa & Arikara Nation v. U.S. Dept. of the Interior Mr. Purdon. May it please the Court. My name is Tim Purdon and I represent the Mandan, Hidatsa & Arikara Nation. This Court should reverse the decision below and remand this matter back to the Department of Interior so that a sufficient record can be developed on the tribe's jurisdiction under the second jurisdictional prong of Montana v. United States. In deciding whether to issue Slauson a permit to drill this oil well on the Fort Berthold Reservation, the Bureau of Land Management was required to undertake an analysis under the second prong in Montana to determine whether or not the Mandan, Hidatsa & Arikara Nation, through a tribal ordinance, had jurisdiction over Slauson and that well. They did not. Their position today is they need not undertake that examination. If I'm correct, if MHA Nation is correct that such an analysis is necessary, then the Department of Interior in this case has conceded in their brief that there is not a sufficient record on this subject and proper remedy would be remanded. That's at page 41 of their brief. Where would this record take place? I'm sort of looking through the progression of the decision to the review, the State Director's review and on. I wasn't able to sort of land in a spot where this kind of evidentiary hearing would even be an opportunity for the tribe. So to answer first, the Department of Interior here today in their briefing, the agency that is to determine whether or not this well should be permitted, they've conceded that regardless of the answer to that question, and I will give you my answer, but regardless of that, this has to go back for that determination. If it's at issue. If it's at issue. If the Montana exception. If the Montana exception. Right. And just to finish with Judge Kelly's question, it's our opinion that in the administrative litigation of this, that when the tribe filed its appeal to the Interior Board of Land Appeals, it requested a thorough hearing, I'm quoting, a thorough hearing on the setback ordinance. And that that was likely to take place before, as we've called it in our brief, this sort of circular buzzsaw of events stymied and took away from the tribe the ability to present that evidence. Was there any time before that during, it seems like there's been a lot of process, right, the EA and the FONSI, and so at a minimum there's some overlap of issues, right, sort of of the impacts of this well pad and its location on the water. The water supply, yes. And so was there, was there any point in that process where the tribe could have come in and sort of said, hey, we've got a Montana exception number two issue? Wait until she finishes her question. Yes, I'm sorry. I apologize. I apologize. Go ahead. It seems like there's been a lot of process. I agree with that. But as we sit here today, the United States, the Department of Interior concedes that that is a record on which we can analyze. Well, counsel, they say that they're different than Slauson a little bit because they quite say, you know, you, the tribe may still have some kind of jurisdiction over them, right? I'm sorry. I don't understand your question. Okay. I'll go very slowly. As I understand the case, the BLM takes the position that even after they give the permit and everything that's gone on on this, that your client may still have some kind of jurisdiction over them. I think that the, as I understand the department's position here, the government's position, it's that they need not under, in determining whether or not to give this permit, they don't need to undertake a Montana analysis, right? Correct. That's what I'm saying. I disagree with that, okay? And I'll tell you why I disagree with that. I think because, well, I think we take a step back. I think what the Department of Interior is arguing is that the tribe doesn't have jurisdiction over BLM, that the tribe's ordinance is not, that's not the tribe's argument. And that's not, the tribe's argument is that the ordinance, which again, I haven't gotten into the facts, but it seems like you're with me, that, you know, there's this ordinance, you've got to keep the well a certain distance away from the lake, that that ordinance under the second prong of Montana gives the tribe jurisdiction over Slauson and this well. And the Department of Interior says, oh, we don't even have to get into that. There's no jurisdiction over us, BLM, so we don't even have to get into that. And that's the error here. This needs to be remanded so we can build a factual basis. I mean, to step back again, under Montana II, it's a foundational precept in federal Indian law that a tribe retains jurisdiction over non-Native conduct within the exterior boundaries of the reservation where the conduct of the non-Native, the non-Indian, threatens or has some direct effect on the political integrity, economic security, and health and wealth of the tribe. Is it your position that it's the BLM's obligation to initiate that on its own as the agency, or is that something that the tribe needs to, I'm not, again, I guess it's looping back to my earlier question, or is it the tribe's obligation to sort of step in and say, we need fact-finding, not just on the EA, the FONSI, we need it on this particular issue. Who needs to come forward on that? Well, I think with where we are today, I think the government is conceding that, you know, there's a threshold issue that this Court has to decide. Does the Montana II exception, does the BLM have to undertake an analysis of that? They're conceding that they didn't do that, and that remand would be necessary. So I think they're conceding that if that is the case, that a remand should occur, and that's where that analysis would take place. So in the course of the proceedings, there's several mentions, whether it's on the OHA's reversal, it mentions Montana briefly, but that's not, it says, you know, that didn't reach that standard, then it gets to the district court, the same thing. So are you saying that, you're saying that that's never been addressed, and I am trying to kind of figure out, has the Montana exception number two been addressed by the agency, which then, of course, impacts whether the district court can rule on something that the agency didn't? All I can glean at this point is that they say today on this appeal that it doesn't apply. Again, I think that their position is the tribal ordinance doesn't give the tribe jurisdiction over BLM. That is not the tribe's position. We're saying that if, and here's why it matters. If the tribe has, excuse me, if you undertake a Montana analysis, we'll build a factual record and we'll decide, does this impact the potential health and welfare of the tribe? We'll have that, we'll build that factual record and we'll have that decision. If the decision, if the determination is made, yes, a well this close to the tribe's primary water source does create a problem, then what does that mean to BLM as they consider this permit? Here's what I would say. That setback law is a valid regulation by this tribe using its retained sovereignty. If BLM recognizes that the tribe has jurisdiction over Slauson, has this regulation, they're not in compliance, but they grant the permit anyway, BLM grants the permit anyway, BLM's conduct violates its trust responsibility to protect tribal sovereignty. And that's the- Could the tribe sue Slauson directly as sort of, I mean, there's that carve out in the permits, but you still have to comply with local and tribal law. And I understand it's a little bit of an oddity because they haven't. But could the tribe have brought suit and would that have triggered the Montana exception number two analysis? The tribe could have brought suit, but I think that had the tribe brought suit, that Slauson and the United States would have argued that the tribe needed to exhaust its administrative remedies before it brought suit. And the point that you, the second point you made there, the department's position is we don't need to analyze Montana. But in the permit it actually granted, it said to Slauson, you have to comply with tribal law. We don't know if Slauson is in compliance with tribal law because we've never been – we need a remand to build a factual basis. Have you brought in enforcement action directly against Slauson? The tribe has not filed a suit against Slauson. I have approximately five and a half minutes remaining. I'd like to reserve the remainder of my time for rebuttal. You may. Thank you. Ms. Blaha. Good morning. May it please the Court. I'd like to frame the issue before the Court briefly and then turn to the tribe's Montana arguments and then its complaints about the record, if the Court has questions about those. So just to frame it, the only issue before this Court is whether the BLM's approval of the permits to drill was arbitrary and capricious. So the burden is on the tribe to show that the agency has not done something that it needed to do or that its action was otherwise arbitrary. And in its brief before this Court and even here today, I still have not heard anything as to why the Bureau of Land Management or the Department of the Interior is required to evaluate the jurisdiction of another sovereign and do that as part of a federal permitting process. If the permit, though, grants a private individual permission to engage in conduct within the reservation boundaries, right? So they're kind of the conduit. So it's kind of, BLM's permitting process in Slauson can't be completely separated, can they? Because without the BLM, the private Slauson can't conduct its conduct where it wants to conduct it. Well, in this case, that's true because they're accessing a federal lease. But there are other cases, I mean, this is private land overlying private minerals. They're drilling horizontally into a mix of federal private leases. If it was a case where only private leases were being tapped, there wouldn't be a BLM role. And that's where I'll go jump to some of the questions the court was asking earlier. The tribe retains its sovereignty. It has recourse here. The BLM has not done anything to fail to protect or impair the tribe's sovereignty. It can go and bring enforcement action against Slauson or anyone else within its lands that it feels is violating its laws. Now the non-Indian might contest jurisdiction. And that is exactly how Montana and every case interpreting Montana has arisen. It is the tribe asserting jurisdiction, saying, we're going to prosecute you in our courts or hear your case in our courts. We're going to assert taxation jurisdiction, law enforcement jurisdiction. And if that's challenged, then that's how the Montana analysis comes up. It does not come up in agency permitting decisions. So I may have deviated too far from your question, but hopefully have gotten to it. Is this, to your knowledge and your experience, has this kind of issue ever come up where a permitting process, there's a controversy as to whether tribal law applies? Not to my knowledge, and I found no reported case. In our view, this is unprecedented. And if I can address some of your questions to my fellow council about sort of when and where does this happen, I think that is very much a concern of the agency. So keep in mind the process here, the applications for permit to drill, going through an environmental review process, that's governed by federal law, the Mineral Leasing Act, and the agency's regulations. They're doing an environmental assessment. They're talking to other interested sovereigns, including the state, as well as the tribe. The decision is being made by a BLM field manager as to whether to approve these permits to drill. It is not that there's no space in that process and no authority, no federal law, no federal regulation that tells the agency, oh, and you need to go and do this, what I think this process, process services, it's a pretty complex analysis. You should also go and make a legal determination of another sovereign's jurisdiction. It's in our view quite unprecedented in a permitting context. And so it's not part of what BLM is doing as part of its review of the applications for permits to drill. And I think the only issue that's come up here and a little bit of the confusion is the tribe then started saying, you need to address our jurisdiction. And so some of the administrative appeal decisions, the state director decision, and then the OHA director's decision, are faced with this argument from the tribe. And so they do address it in a secondary way. They say, we don't think you've shown evidence that you have jurisdiction here. But the primary basis that the agency made this decision is, this isn't part of our job. This isn't something that we're tasked with doing by Congress. And so we're not doing it. That's interesting because they do get in, those are two different answers to an argument from the tribe in that process, right? One is, well, that's just not, that's just not in our wheelhouse of issues to deal with. But they did go one step further and say, you haven't proven it. You haven't showed it. And so then that sort of triggers, well, if that's the reason you're denying it, we've never had an, I think their point is then we've never had an opportunity to show it. Does that, does the reason for the agency's dismissal of that argument matter in our review of the agency process? So I think the reasons are independent. And I think it's clear that the agency at each stage was always saying, this isn't, we're not bound by tribal law. We're not required to make this determination. That was very clear in the initial decision because this is, as I say, unprecedented why the agency would be making this decision. And then I think that's clear in the OHA director's decision and also in the state director's. But that was maybe more of an intermediate decision. So that was always a basis for rejecting the claims of the tribe. I think the decision makers feel compelled to respond to the argument that's being presented to them. And so they also have, they did opine on whether sort of the evidence that the tribe had then brought forward was sufficient to show meeting the second exception. But I don't think that was a necessary grounds for the denial. And I don't think it's a necessary grounds for this court to kind of reach in and opine on the scope of tribal jurisdiction in this case. So how would the tribe establish that this conduct falls within a Montana exception number two in your view? Would it be just directly suing Slauson before they got to act on their permits and get some sort of a stay? How would that, in your view, how would this work? How should this have worked? Yeah, I mean, I don't know the details of the tribe's sort of enforcement regime for its laws, because it is a separate sovereign and so it can handle that separately. But yes, I would think it would notify, it needs to provide notice to Slauson that it's violating a tribal ordinance and move to bring whatever enforcement actions its law provides for to enforce that tribal ordinance. Slauson might then challenge the tribe's jurisdiction. And then those parties can litigate, you know, before perhaps the tribal court first, and then often these things end up before a federal court, litigate the question of whether any of the exceptions that are identified in Montana have been met. So there's absolutely a path and that is the path that tribes all over the country pursue. That's the only path that I'm aware of in which the question of Montana has been addressed in kind of this permitting context. I think I've actually addressed the bulk of my points. Does the court have any other questions? What's the extent of your concession? The counsel references umpteen times, several times, your concession. Tell me what you consider the scope of your concession. It's on a couple of pages of your brief, I understand that, but tell me in plain language what it is and what it isn't. Absolutely. I think our concession has been greatly overstated. I think we've stated repeatedly that this was not necessary for the agency to address this, that there's no source of law that requires the agency to address this, and that that's well reflected in our decision. I think that point was just to make clear that because it's not part of the permitting decision, it's not part of that environmental analysis, it's not part of the NEPA analysis, and this court, as I mentioned before, has recognized it's a pretty complicated factual analysis. The agency isn't saying that it did undertake that. The agency did not undertake a Montana II analysis in the first instance. So if the court finds that as part of every permit that BLM issues, it has to consider the scope of other sovereigns' jurisdiction, specifically here this tribe's jurisdiction, we simply conceded we did not do that in the first instance. I think there's a little bit of a nuance there with respect to when the tribe has come forward and put forward its evidence as to why it meets the second Montana exception. Again, I'm in a world where I'm not sure who has all the burdens here and when this was passed, but I think you could also uphold the decision on the basis that they didn't come forward with that evidence. So our position is very, very narrow. It's just literally, if you want to reach and hold something that to our knowledge has never been held before, which is that the agency must do this as part of a permitting decision for these permits to drill, the agency did not do that here. Roberts. Thank you, counsel. But you say that that doesn't concede away the case. Oh, no, not at all. I mean, I think that gets you to the second point you just made, that the tribe did not come forward, although it had the opportunity to do so. Yeah. I mean, I think this is, you know, what sometimes defendants have to do here, which is we think we should win for this reason, this reason, and this reason. If you reject all of those reasons, you know, what is the appropriate, if we lose, what is, you know, what is the appropriate response? The government often discusses sort of whether a remand is appropriate. So I don't, I don't, I think it's been overblown quite a bit to suggest that we've actually conceded anything on the merits of the case. Oh, sure, proceed. So if we're in that world, what, in your view, what would have been the appropriate steps for the tribe to take? I know you don't think we're there, but you mentioned it. So what would be an example here of what the tribe could have done that it didn't do? Yeah, well, I'm struggling a little because, you know, agency processes are governed by their regulations and by statute, and it doesn't really allow for this. And so I suppose they could have put forward more evidence, first of all, before the decision is made, because that's really when the record is being created. The administrative appeals process is meant to be generally based on the record before the original decision maker. It's not meant to be a time to introduce a lot of new evidence. But there is a process where they can request to submit new evidence, but they didn't do so here. So I suppose they could have asked, and if the Interior Board of Land Appeals or the OHA director thought it was relevant to take new evidence, they have a process for having a hearing before an ALJ. But I'm struggling because it's just unprecedented. Well, I know that the, I think this is correct. In fact, everyone knew in the proceeding that the tribe had the 1,000-foot setback, right? But I'm gathering what's really of concern to the tribe is the threat, possible threat to the purity of the lake as far as a source of drinking water. Yeah. So was any of that, did the BLM get into any of that? And what's... Absolutely. I mean, this is absolutely the subject of the environmental review that was done by the Bureau of Land Management. But they haven't challenged that. We have a finding of no significant impact here, an environmental assessment that did consider impacts on water. And they didn't bring a NEPA claim. They didn't say that environmental analysis was insufficient. And so was that review and findings then published and with opportunity for even public comment? Absolutely. It was part of a, I mean, this process took six years. There was lots of communication with interested parties. The draft environmental assessment was published, then the final. And this was, these were all subjects that they could, you know, address before the agency and then before this Court if they chose to, if they had preserved those claims, but they did not. Thank you. Thank you, Judge Bateman. Other questions? Okay. Thank you for your argument. Mr. McElroy. Good morning, and may it please the Court, Dan McElroy on behalf of Slawson. The agency argues that it was not obligated to assess whether the tribe has jurisdiction, and that is accurate. But the fact of the matter is, they did make that assessment and concluded that the tribe does not have jurisdiction. And this Court can affirm the district court on those grounds as well. And Judge Kelly, you asked the question of, you know, when did this occur? Did it occur? Did the agency evaluate the Montana question? And I would direct you to Slawson Appendix pages 31 through 34, when the State Director of the BLM said, quote, the tribe has not presented any evidence of why a 600-foot setback compared to a 1,000-foot setback would threaten the health or welfare of the tribe. And went on to apply the, quote, basic rule of Montana, that tribes are without jurisdiction to adjudicate or regulate the activities of non-members of the tribe. So Montana was applied by the agency, and that is an additional ground on which this Court can affirm. But, counsel, that doesn't prevent any enforcement action against you now, right? The tribe could have brought an enforcement action. No, can they now bring an enforcement action against you? It's a good question. There's probably statute of limitation issues that were not part of this case, and I don't know the answer to that question. Could they have then? Certainly. Could they now? I don't know the answer to that question. Are you operating it? Yes. Okay. How long have you operated it? The wells have been operational for five years. Thank you. I'm sorry. No, I'm fine. Were you referencing the April 24th State Director review when you were quoting? I believe that. I can't remember the day off. Maybe you can help me understand that document. It just sort of lays out the arguments on either side, and then just says, we affirm the decision of March 10th. What you've quoted, I thought, was just quoting what your client or BLM said, rather than what the State Director's review was saying? No, that is the State Director responding to. So the State Director lays out the tribe's arguments, and then provides a response on behalf of the BLM. Okay. So that's when they say BLM. They're speaking on behalf of the BLM. Correct. So the way it works is the BLM does this investigation, comes up with its conclusions, issues the permits, and then the tribe has a right to appeal that to the director, the State Director of the BLM, which is what they did. So I'll just briefly note the Montana standard. It's uncontested here. We're the only ones. We're the only party who laid out what that standard is. And there's two key uncontested points. One, because this is non-tribal activity on non-tribal land, the effort at regulation here is presumptively invalid. And two, the tribe has the burden of showing the agency, approving to the agency, overcoming that presumption by showing that this project poses a catastrophic threat, and that regulation is necessary to avoid it. They didn't show that in front of the agency. They didn't show it in the district court. They haven't even tried to show that here. So again, Montana presents another ground on which this court can affirm the district court. As for this supposed concession that the government made, the government is not able to effectively concede anything. The question this court has to answer is whether the administrative record contains a rational basis for the final agency action, and it does. And a change in litigation position, what they're saying now is different than what they said in the district court. A change in litigation position does not. You say the government is saying something different. Correct. They argued the same thing we argued in the district court. That change in position does not alter in any way the administrative record and whether it contains a rational basis. And with my 10 seconds, I just want to note it hasn't gotten much airtime here, but the tribe had every opportunity to develop a factual record. They had many, they had years of opportunities to submit whatever evidence they have. They didn't do so, and it's too late to do so now. Thank you for your argument. Thank you. Mr. Purdon. The government says that the request by the tribe here to have the agency take a look at the Montana applicability of the tribe jurisdictional response is unprecedented. This is belayed by the permit in this case. The permit in this case. What about the precedent? Do you have a case or a similar situation of cases? There have been lots of tax cases, I know, by tribes all across the country. There's no case on point with this situation. I concur with that. Okay, proceed. But the permit in this case says it is the responsibility of the operator, Slauson, to obtain all necessary permits and comply with all applicable Federal, State, and easements. The permit in this case says this. But BLM says it's unprecedented that they would determine whether or not that condition is being fulfilled. Further, I direct the Court to footnote one in BLM's brief on page 31, where BLM says, well, yeah, we didn't examine Montana and determine whether or not they have to comply with tribal law in this case, but we have the discretion to do that, and sometimes we do that. They say, as a matter of discretion and pursuant to its Federal authorities, BLM may require that operators demonstrate compliance with requirements found in tribal law, and thus, in appropriate circumstances, under Federal law, BLM may exercise its discretion to require that operators demonstrate compliance with tribal law. So they're saying, we sometimes do this, but it's unprecedented that we would be asked to do this. That is incongruous, incongruous, and those arguments should be rejected. Finally, I don't believe it's contested here, but the fact of the matter is, is that currently on the MHA reservation, as additional well pads are approved, the BLM is requiring operators to comply with the setback. But that's on tribal land? Is that what you said? In similar situations. In similar situations. And that's not in the record, though? That's not in the record, but I don't believe it's contested. Oh, boy, this administrative review, per se. Yeah. Yeah. So I think that, to say that this is unprecedented is belied by the Department's routine, or the BLM's routine conduct in dealing with these issues. Well, is the requirement of tribal law or regulation that the tribe wants to enforce here, is it solely the 1,000-foot setback? That's... I mean, is it something, is it just the 1,000-foot setback, or is it something else, that the tribe has this evidence that anything closer to the lake is going to pollute the lake water, that kind of thing? The tribe wants to have the opportunity to conduct an evidentiary hearing to put on evidence of why the 1,000-foot setback is necessary to protect the health and welfare of the tribe, and thereby create Montana to jurisdiction. Did the environmental assessment and the statement of no significant impact, did that handle that? It did not. I don't have the statement in front of me. And why wasn't that the place for you to really make your argument? Well, I think that Judge Kelly's description of the State Director's decision, which was then is insightful, that that's a permit-issuing approval process, and then it's at the IBLA, the Land Board appeal, that that opportunity for evidentiary hearing would exist. Counsel, you completely dodged my question. I did not. The FONSI, the Environmental Impact Statement, if you look through our brief, I don't have it in front of me, but there's very little discussion of the drinking water impact. There's a big discussion of the groundwater impact. My question is, did you object to it? Did you, the tribe, object to this? Yes. The tribe appealed routinely. Oh, excuse me. Appealed, attacked the environmental assessment. The environmental assessment led to the permit, which the tribe appealed to the State Director, saying no. It appealed it to the State Director and then to the IBLA. And under, so, I mean, yes, the tribe has appealed and pushed back and said, you need to consider our assessment as a matter of protecting our drink water consistently in this litigation. But wasn't there an opportunity to present evidence by the tribe? I'm sorry. By the tribe. Wasn't there an opportunity given here in the process to submit evidence and even to request an evidentiary hearing? The tribe did request an evidentiary hearing from the IBLA, said ask for a thorough hearing under the CFRs. They can have a CFR 43, CFR 4.415. The IBLA can have an evidentiary hearing. The tribe requested that. And then we had the situation where there was a TRO process in federal court and the Office of Administrative Hearings in Washington reached down into the administrative case and pulled this away from the IBLA judge, who actually granted the tribe stay and said, yes, we need to look at the Montana part of this. We need to look at this. This is an important new issue. We need to have a thorough hearing. So that was the opportunity. I see that my time is up. I will close by saying that this Court should reverse the decision below and remand this matter back to the Department of Interior so we can have this evidentiary hearing to determine the factual basis as to whether or not the tribe has jurisdiction over Schlosson and its well. Thank you. Thank you for your argument. Case number 22-2459 is submitted for decision by the Court.